AO106 (Rev. 12/03)  Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

|  MIDDLE  |  DISTRICT OF  |  ALABAMA  |

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

189 John Morris Avenue, Montgomery, Alabama

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

Case Number: $2:14mj166$-SRW

I, ___Dennis R. Reed, II___ being duly sworn depose and say:

I am a(n) __Special Agent with the Federal Bureau of Investigations__ and have reason to believe
                              Official Title

that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)

189 John Morris Avenue, Montgomery, Alabama

in the ___Middle___ District of ___Alabama___

there is now concealed a certain person or property, namely (describe the person or property to be seized)

189 John Morris Avenue, Montgomery, Alabama

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
property that constitutes evidence and instrumentalities of the commission of a criminal offense

concerning a violation of Title ___21___ United States code, Section(s) ___841 and 846___

The facts to support a finding of probable cause are as follows:

See attached Affidavit

Continued on the attached sheet and made a part hereof:     ☐ Yes     ☑ No

_Dennis R. Reed, II_
Signature of Affiant

Sworn to before me and subscribed in my presence,

_10/7/14_                                              at     Montgomery          Alabama
Date                                                               City                        State

SUSAN RUSS WALKER, U.S. MAGISTRATE JUDGE
Name of Judge              Title of Judge                Signature of Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

IN THE MATTER OF THE SEARCH OF 189
JOHN MORRIS AVENUE, MONTGOMERY,
ALABAMA

Case No. 2:14 mj 1166-SRW

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A WARRANT

I, Dennis R. Reed II, Special Agent of the Department of Justice, Federal Bureau of
Investigation (FBI), being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am currently employed as a Special Agent with the Federal Bureau of
Investigation, hereinafter "FBI," and have been since February 24, 2013.  As a Federal Agent, I
am authorized to investigate violations of United States laws and to execute warrants issued under
the authority of the United States.  I have received cyber training, to include computer related
crimes. Additionally, I have nine years of previous investigative, police experience working with
the Prattville Police Department in Alabama. I am currently assigned to the Mobile Division,
Montgomery Resident Agency of the FBI. During this time, I have been involved in the
investigation of violations of federal statutes pertaining to child exploitation crimes, health care
fraud, criminal enterprises-gangs, civil rights, bank robbery and other violent crimes. I have
received training for the purpose of investigating violations of federal criminal statutes.

2.      I am familiar with the investigative techniques used in these investigations, such as the
use of undercover agents, the use of cooperating individuals, witnesses, the analysis of telephone
toll and pen register information, search and seizure warrants, grand jury investigations, and
interception of wire and oral communications.

1

3.     I am familiar with the ways in which gang members and narcotics traffickers conduct

their business, including, but not limited to, their methods of importing and distributing

controlled substances, their use of mobile telephones, and their use of code words to conduct

their transactions. I am also familiar with methods in which narcotics traffickers use stash

locations to hide narcotics, weapons, records, and narcotics related paraphernalia, from law

enforcement.

## BACKGROUND INFORMATION

4.     Based on my training, experience, and participation in numerous investigations involving

narcotics importation and distribution organizations and in financial investigations involving

large amounts of controlled substances, currency and other monetary instruments, I am aware

that:

a.     Large scale narcotics traffickers must keep on hand large amounts of United States

Currency in order to maintain and finance their ongoing drug business.

b.     Drug traffickers very often place their assets in the names of others, including parents,

spouses, and children to avoid detection of these assets by law enforcement.

c.     Even though these assets are in other names, the drug traffickers' continue to use these

assets and exercise control over them.

d.     Drug traffickers encounter tremendous problems handling large sums of U.S. currency

through financial institutions because of the currency transaction report which is required to be

completed and filed with the Internal Revenue Service any time cash transactions exceed

2

$10,000, which causes them to maintain large amounts of cash in other, easy to access, but secure places, such as safe deposit boxes, and safes and family and close friends' residences.

e.      Drug traffickers maintain telephone books, both personal and electronic, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the importation, transportation, ordering, sale, purchase, and distribution of controlled substances.

f.      These aforementioned telephone books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers are stored and readily available to the drug traffickers in their houses, storage sheds, rent houses, safes, banks, safety deposit boxes, family and close friends' residences, vehicles and places of business.

g.      It is common for large scale drug traffickers to secrete contraband, including controlled substances, proceeds from drug sales, including personal items, electronic items such as televisions, VCR's, stereos, and records of drug transactions in secure locations such as safes, lock boxes, safety deposit boxes in their names and relatives' and close friends' names for ready access, and to conceal them from law enforcement.

h.      Persons involved in drug trafficking conceal in secure locations, with ease of access, large amounts of currency, financial instruments and evidence of financial transactions relating to the obtaining, transfer, secreting and spending of large sums of money obtained from engaging in drug trafficking activities.

i.      Persons involved in drug trafficking conceal in secure locations, with ease of access, weapons (firearms) to protect themselves; property; currency; and, drugs.

3

j.      When drug traffickers amass large amounts of money from trafficking in illegal drugs, they attempt to hide their illegal origin. In order to accomplish this, they use banks, cashier's checks, money drafts, pre-paid debit cards, real estate and business fronts.

k.      Documents relating to such attempts to hide the illegal origin of such proceeds are kept where the traffickers have ready access to them, often in their houses or structures over which they have control, in their friends' and relatives' houses, places of business, vehicles and often in close proximity to illegal drugs.

l.      It is common for drug traffickers to travel to major distribution centers and cities such as New York, Miami, Atlanta and Houston to receive and distribute drugs. These methods of transportation include commercial airlines, commercial vessels, private aircraft, rental vehicles, and other means of transportation.

m.      It is common for drug traffickers to keep and maintain records of their travels in locations for easy access such as their residences, the residences of their relatives and close friends, places of business, vehicles and other structures over which they exercise control.

n.      Drug traffickers commonly maintain addresses or phone numbers in books, papers, compact electronic telephone books which show names, addresses, and/or telephone numbers for associates in the trafficking organization, and they keep such records in their homes, in their relative's and friend's homes, places of business, vehicles or other structures over which they exercise control.

o.      Drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their drugs; they usually keep these photographs in their homes, their relatives' homes or places of business with other drug related documents.

4

p.     Drug traffickers often maintain and utilize cellular phones and pagers to facilitate drug trafficking. It is common for these communication devices to be listed in other persons' names. However, drug traffickers continue to use these devices and maintain control over them. Drug traffickers keep billing records for these mobile phones and pagers in their homes, their relatives' homes or businesses or other structures over which they exercise control so they are readily accessible.

q.     It is common for drug traffickers to use cellular phones, fax machines, pay phones, and long distance calling card services to avoid detection and interception by law enforcement agents.

r.     Drug dealers often maintain records stored electronically on computer hard drives, notebooks, laptops, computer disks, and USB or "flash drives."

5.     This affidavit, which is based upon personal knowledge and knowledge obtained from other law enforcement officers, is submitted in support of an application for warrants to search the following properties and persons:

a.     The residence and all out buildings at the premises and vehicles located at **189 John Morris Avenue**, Montgomery, Alabama, a grey-sided, single story home, located off of Norman Bridge Road (I have attached a photograph of the front of the home as "A").

b.     The person of Earnest **STROMER**, a.k.a. "Junior," a black male, approximately 6'00" tall, 170 lbs., brown eyes, black hair, with a date of birth August 4, 1983.

6.     This application for search warrant to search the above mentioned properties and individuals is based on probable cause to believe that located therein or thereon is evidence

5

related to narcotics offenses as described in Title 21, United States Code, Section 841 (a)(1), and 846, and firearms violations as described in Title 18, United States Code, Section 924(c).

7.      Except where otherwise noted, the information set forth in this affidavit has been provided to me directly or indirectly by agents of the FBI, the FBI Central Alabama Safe Streets Gang Task Force (CAGTF), the Montgomery Police Department or other law enforcement officers. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Such statements are among many statements made by others and are stated here in substance, unless otherwise indicated. Similarly, information resulting from surveillance does not necessarily set forth my personal observations, except where otherwise indicated, but rather has been provided directly or indirectly by other law enforcement officers who conducted such surveillance.

## FACTS AND CIRCUMSTANCES SHOWING PROBABLE CAUSE

8.      This section is intended to provide an overview of the investigation and the organization that is the subject of this Application. Specific information and sources for your Affiant's knowledge of the facts and circumstances are provided in the text of this affidavit.

9.      In 2010, the FBI joined with the Montgomery Police Department to investigate a criminal enterprise centered in Montgomery, Alabama, called the Vineyard Gang. In late 2013, the FBI, the Montgomery Police Department, and other local law enforcement agencies joined to form the FBI Central Alabama Safe Streets Violent Gang Task Force (CAGTF). The combined law enforcement resources of the CAGTF have now been focused on the Vineyard.

10.     The Montgomery Police Department (MPD) has long devoted substantial resources to deal with a high crime area known as the "Vineyard." The Vineyard has long been a troubled neighborhood riddled with violent crime and drug trafficking. Violent crime in the Vineyard includes shootings, home invasions, and murder. MPD has long been aware of many individuals living in the Vineyard neighborhood who have a long history of narcotics trafficking, robberies, home invasions and other criminal activity. The Vineyard is a neighborhood located in south Montgomery, Alabama consisting of John Morris Avenue and Martin Patton Avenue. The two streets join to form a "U" shaped neighborhood off of Norman Bridge Road. The criminal gang members who live and conduct their criminal activity in the Vineyard also refer to themselves as "Two Street" indicating the two streets that make up the Vineyard neighborhood. On Facebook social networking sites, Vineyard members can be seen posing with large amounts of cash, weapons, and flashing two fingers for the "Two Street" designation. Posters, artwork, and jewelry images posted on these Facebook pages contain the Vineyard Gang name alongside the Two Street moniker.

11.     **EARNEST LEE STROMER, JR. (Alias: "Junior")**, Date of birth: August 4, 1983. **STROMER** previously resided at **259 John Morris Avenue**, Montgomery, Alabama. **STROMER** is one of the main hubs of criminal activity in the Vineyard. **STROMER** is a large distributor of cocaine and weapons to the Vineyard and other gangs and criminal enterprises in the Montgomery area. **STROMER** has sold crack cocaine and firearms to a confidential informant.

12.     On March 9, 2011, CI-1 made a controlled purchase of crack cocaine from **STROMER**. In the presence of Agents, CI-1 made a consensually recorded call to **STROMER** at (334) 414-6031. **STROMER** did not answer and the call went to voicemail. CI-1 was equipped with an

7

audio recorder and given buy money. CI-1 and his vehicle were searched and no drugs, money, or firearms were located. Agents conducted surveillance of CI-1 as he went from the meeting location to the Vineyard neighborhood. Agents waited outside the Vineyard neighborhood as CI-1 went to **STROMER**'s house at **259 John Morris Avenue, Montgomery, Alabama**. Once inside **STROMER**'s house, CI-1 asked him for a "1-5" meaning one and half grams of crack cocaine. CI-1 and **STROMER** discussed the cocaine and discussed weighing it on a scale. CI-1 paid $65.00 for the crack cocaine and left. Agents guided CI-1 back to the meeting location after he left the Vineyard neighborhood. A field test by Agents indicated the substance was cocaine.

13.    On May 31, 2013, CI-1 made a controlled purchase of a firearm from **STROMER**. In the presence of Agents, CI-1 made a recorded telephone call to **STROMER**, phone number (334) 414-6031. CI-1 told **STROMER** that he wanted to purchase "a good chopper, if the money right." **STROMER** told CI-1 "yes" and to call him when he got to the Vineyard. **STROMER** agreed and told CI-1 to come to his house. CI-1 was equipped with two video recorders and $700.00 of buy money. Agents followed CI-1 to the point that he entered the Vineyard neighborhood. CI-1 arrived at **STROMER**'s house, **259 John Morris Avenue,** Montgomery, Alabama, and parked outside. An unknown individual approached CI-1 and began talking to CI-1 about **STROMER.** CI-1 told him he was there to make a purchase. The individual offered to call **STROMER** and as he was doing so, he told CI-1 that **STROMER**'s number was "414-6031". He then handed the phone to CI-1. CI-1 told **STROMER** that he was outside and that he should come out. **STROMER** came out of his house and told CI-1 that they had to go down the street to another house where **STROMER** stored his guns. The video recording showed **STROMER** unlock the door of a house farther down on John Morris Street. Once inside, **STROMER** showed CI-1 multiple assault rifles including an SKS rifle with what

8

**STROMER** called a "100 round" drum magazine. CI-1 and **STROMER** negotiated a price of $450.00 and made the transaction. **STROMER** told CI-1: "I buy everything off the street . . . all I sell is AKs, .223s, and Glocks . . . I got seven assault rifles." **STROMER** then warned CI-1 that he "did not want [the rifle] to back track to" **STROMER**. CI-1 left the house and again met the agents where the evidence was recovered and stored.

14.     On July 19, 2013, CI-1 made a controlled purchase of a firearm from **STROMER** and a controlled purchase of crack cocaine from another individual. CI-1 made a recorded call to **STROMER** at (334) 414-6031 and told **STROMER**, in coded language, that he wanted to purchase three grams of crack cocaine and a gun. **STROMER** agreed and told CI-1 to come to his house. CI-1 was equipped with two video recorders and buy money. Agents followed CI-1 to the point that he entered the Vineyard neighborhood. CI-1 arrived at **STROMER**'s house and parked outside. CI-1 called **STROMER** and told him he was outside. **STROMER** came out of the house and told CI-1 that he had the gun inside his house. They went inside the house at **259 John Morris Avenue**. **STROMER** showed CI-1 a Bushmaster brand semi-automatic AR-15 rifle with a scope and two attached thirty round magazines. As CI-1 was looking at the rifle, **STROMER** said he had three just like it. CI-1 and **STROMER** negotiated a price of $500.00. CI-1 told **STROMER** that he also needed "3" meaning three grams of crack cocaine. **STROMER** said, "you need three grams? You better go to Cujo's, mine ain't ready yet." CI-1 left the house and again met with agents.

15.     On November 20, 2013, CI-3 made a controlled purchase of marijuana from CURTIS RANDALL CAFFIE. Officers of the Montgomery Police Department equipped CI-3 with a video recording device and buy money and sent CI-3 to the Vineyard neighborhood. CI-3 went to a house at 262 John Morris Avenue. CI-3 met an individual there and told him he was

9

interested in purchasing a gun. CI-3 was told him that the young men across the street had guns. CI-3 went across the street to **STROMER**'s duplex at **259 John Morris Avenue**. CI-3 met CURTIS RANDALL CAFFIE there. CI-3 had a discussion with CAFFIE and told him he was interested in purchasing marijuana. CAFFIE agreed to sell CI-3 marijuana. CI-3 purchased $25.00 worth of marijuana, to which, based on training and experience, law enforcement will attest is marijuana. CI-3 saw that CAFFIE had an old .38 caliber revolver on him. CAFFIE told CI-3 that he would sell him the gun for $80.00. CI-3 told CAFFIE that he did not have the money for the gun at the time.

16.     On November 21, 2013, CI-3 made a controlled purchase of a gun and marijuana from CURTIS RANDALL CAFFIE. Officers of the Montgomery Police Department equipped CI-3 with a video recording device and buy money and sent him to the Vineyard neighborhood. CI-3 went to the duplex located at **259 John Morris Avenue**. CI-3 met with CURTIS RANDALL CAFFIE. CI-3 purchased $25.00 worth of marijuana, to which, based on training and experience, law enforcement can attest, is marijuana. CAFFIE then walked to the back of the residence and returned with a .38 caliber Iver Johnson revolver. CI-3 paid CAFFIE $80.00 for the .38 caliber revolver.

17.     On December 10, 2013, CI-1 made a controlled purchase of crack cocaine and a firearm from **STROMER**. At 11:49 a.m. and 3:08 p.m., CI-1 called **STROMER** but got **STROMER**'s voicemail. At 3:10 p.m., CI-1 called **STROMER** and when **STROMER** answered, CI-1 asked, "You ready?" **STROMER** said to give him a minute, that the person he was getting the pistol from would be there when school got out. They agreed to 3:30 p.m. At approximately 3:45 p.m., FBI Agents equipped CI-1 with two video recorders and buy money. Agents followed CI-1 to the point that he entered the Vineyard neighborhood. CI-1 arrived at **STROMER**'s house and

10

parked outside. An Agent watched and recorded on a closed circuit television camera which had a view of **STROMER**'s house as CI-1 parked outside. CI-1 called **STROMER** and told him he was outside. **STROMER** came walking down the street and up to CI-1's driver's side window. CI-1 asked; "what you got that I can make some money off of? . . . .need six g's . . .", **STROMER** finished ". . . and a quick handgun." They agreed and **STROMER** went into his house. **STROMER** returned and pulled a Glock handgun with an extended magazine from his waistband, unloaded it and showed it to CI-1. TABORIS LADALE MOCK then joined them at the window. While CI-1 was examining the gun, he asked, "You got my six g's?" **STROMER** looked around and said "got your six g's too." **STROMER** said he wanted $450.00 for the Glock. TABORIS LADALE MOCK handed CI-1 a loaded .45 caliber Taurus pistol, but **STROMER** took it and walked away while CI-1 examined the Glock pistol. MOCK remained and exclaimed the virtues of the "Colt 45" and said they wanted $400 for it. S**TROMER** returned and negotiated with CI-1. CI-1 then started talking with a woman who walked by. **STROMER** returned, took the Glock and handed CI-1 the .45 caliber Taurus pistol. **STROMER** said "I'd rather sell you that one" as he put the Glock into his waistband. CI-1 asked "where is my stuff at?" **STROMER** said "we got to go down the street to Cujo's house." CI-1 said that he wanted to buy directly from **STROMER**. **STROMER** said " . . . I gotta drop." CI-1 persisted and **STROMER** said, "I dropped a twenty eight last night and that bitch went to twenty four." In the experience of your Affiant, I believe that **STROMER** meant that he had cooked down twenty eight grams of powder cocaine into twenty four grams of crack cocaine.

CI-1 asked "Where is it at?"

**STROMER:** "In the house . . . I'm taxing it. . . "

CI-1: "How much?"

11

**STROMER**: "$350, six grams"

CI-1: "Go get it."

**STROMER** left then returned shortly with the crack cocaine. They talked about the purity and future deals. CI-1 paid **STROMER** $780.00. CI-1 left the Vineyard neighborhood and Agents guided him back to the meeting location. Agents recovered the .45 caliber Taurus pistol and the crack cocaine. Records checks indicated that the pistol had been stolen in a burglary of a gun store. The substance tested positive for cocaine.

18.     On January 3, 2014, CI-3 made a controlled purchase of marijuana from CURTIS RANDALL CAFFIE. Officers of the Montgomery Police Department equipped CI-3 with a video recorder and buy money. CI-3 went to the Vineyard neighborhood and walked over to **259 John Morris Avenue** where he met CURTIS RANDALL CAFFIE. CI-3 entered the house and found **STROMER** and others were sitting in the room. **STROMER** and the others were talking about the shootings at the Centennial Hill Bar (formerly known as The Rose Supper Club). **STROMER** was giving his first-hand account of the shootings and talking about TABORIS LADALE "Goonie" MOCK being there. **STROMER** said that MOCK had a gun also and pulled it out, but MOCK told people it only had blanks in it. CAFFIE told the group that he was there too. CI-3 purchased a half ounce of marijuana for $45.00 from CURTIS RANDALL CAFFIE. Officers recovered the drugs from the CI. A field test was positive for cocaine and, based on training and experience, officers can attest that the drugs were marijuana.

19.     On January 14, 2014, Officers of the Montgomery Police Department equipped CI-3 with a video recorder and buy money. CI-3 went to John Morris Avenue. CI-3 walked over to **259 John Morris Avenue**. When he arrived, CI-3 met a person who introduced himself as "Quez." Through surveillance, Agents were later able to identify "Quez" as SANQUEZ

12

DEONTRA BIVENS. CI-3 asked BIVENS for $10.00 worth of marijuana. BIVENS reached into his pocket and pulled out the marijuana. CI-3 then asked for BIVENS's telephone number which he gave as (334) 538-2358. CI-3 returned to meet with Officers of the Montgomery Police Department and delivered the drugs. A field test of the drugs was positive for cocaine. Based on training and experience, law enforcement can attest that the other substance recovered was marijuana.

20.     On February 4, 2014, CI-3 made a controlled purchase of a gun and marijuana from CURTIS RANDALL CAFFIE. Officers of the Montgomery Police Department equipped CI-3 with a video recording device and buy money and sent him to the Vineyard neighborhood. CI-3 went to **259 John Morris Avenue**. CI-3 knocked and was told to enter by an unknown male. CI-3 went in and asked for CAFFIE. The unknown male told CI-3 that CAFFIE was not there. CI-3 asked the unknown male to call CAFFIE for him which the male began to do. The unknown male asked: "You're the one that wanted the gun? I have it." CAFFIE was now on the phone and told CI-3 that he was about to pull up at the house. While CI-3 waited, he looked around the room and saw closed circuit television monitors in the room which gave the occupants the view around the outside of the house. A person could be seen pulling up to the house in a car. The man got out, knocked on the door, and was told to come in. Once inside, the man ordered $20.00 worth of cocaine and the unknown male sold it to him. CURTIS RANDALL CAFFIE arrived and sold CI-3 a Jiminez Arms pistol and $25.00 worth of marijuana. Other people in the room could be heard talking about **STROMER**. CAFFIE told CI-3 that "them folks," meaning the police, were nearby, outside the Vineyard neighborhood. CAFFIE gave CI-3 some alternate directions for leaving the neighborhood to avoid the police. CI-3 returned to meet with the officers of the Montgomery Police Department. The drugs and

13

gun were recovered by law enforcement who, based on training and experience, can attest that the drugs recovered were marijuana.

21. On March 6, 2014, CI-1 made a controlled purchase of crack cocaine and a firearm from **STROMER**. CI-1 met with Agents and made a consensually recorded call to **STROMER**. **STROMER** did not answer and the voice mail picked up. As the voicemail message was playing, **STROMER** called CI-1. The incoming call could not be recorded, but your Affiant was present and could hear both **STROMER** and CI-1 for the entire conversation. CI-1 asked **STROMER** if he was ready and told **STROMER** that he wanted a "chopper" and six grams of crack. **STROMER** repeated the order, "You want six grams and a chopper." Your affiant believes that **STROMER** was referring to six grams of cocaine and an assault rifle. CI-1 agreed. **STOMER** then told CI-1 to wait until 3:10 p.m. or 3:30 p.m. when school would be out. CI-1 agreed. Agents waited until 3:10 p.m. then equipped CI-1 with a recording device, buy money, and a transmitter. Agents led and followed CI-1 and he drove to the Vineyard. When CI-1 drove into the Vineyard neighborhood, surveillance Agents remained outside. CI-1 pulled up in front of **STROMER's** house, **259 John Morris Avenue**. Your Affiant could hear over the transmitter as CI-1 called **STROMER** and told him he was outside. CI-1 announced over the transmitter and talked to your Affiant via telephone to say that **STROMER** told him that he was not yet home and CI-1 should wait for him there. CI-1 told **STROMER** that he did not want to wait in the Vineyard, so **STROMER** told him to go wait at the store. CI-1 drove to the Stop and Go convenience store on Norman Bridge Road, just outside the Vineyard neighborhood. Approximately fifteen minutes later, **STROMER** arrived. The video recording shows **STROMER** as he got into the passenger side of CI-1's vehicle, bringing with him a loaded AK-47 style rifle. CI-1 asked **STROMER** to unload the rifle. **STROMER** removed the round for the

chamber and removed the loaded magazine from the rifle. CI-1 asked **STROMER** if he had the other thing he asked him for. **STROMER** pulled approximately six grams for crack cocaine from his pocket. CI-1 and **STROMER** negotiated on a price and settled on $950.00 for both the rifle and the crack cocaine. **STROMER** got out of CI-1's vehicle. CI-1 drive back to the meeting location with surveillance Agents leading and following. Agents recovered the recorder, the drugs, the AK-47 style rifle and a magazine with twenty eight rounds of ammunition. A field test of the drugs was positive for cocaine.

22.     On March 18, 2014 at approximately 1218 hours, Sergeant M.K. Webster #1851 and Detective D.R. Ross #2270 met with a confidential source at a prearranged location. This source will hereinafter be referred to as "A". The meeting was in order to arrange a controlled drug purchase from a subject at **259 John Morris Avenue** Montgomery, AL. At approximately 1221 hours, Sergeant Webster and Detective Ross conducted a search of "A"s person/vehicle for any weapons, money or contraband. This search produced negative results. "A" was then provided with $60.00 of the Montgomery Police Department controlled drug buy money and equipped with an audio/video recording device.  "A" informed Sergeant Webster that his/her vehicle needed some gas because he/she didn't think it would make it until the completion of the buy. Sergeant Webster told "A" to go to the gas station located at 3391 Norman Bridge Road Montgomery, Alabama (Pit Stop). "A" went to this location and purchased five dollars in gas using the Montgomery Police Department Drug Buy Money. Sergeant Webster maintained surveillance on "A" until he/she pumped the gas. The audio/video recording device was recording during this process.  At approximately 1229 hours, "A" arrived in the area of **259 John Morris Avenue** Montgomery, Alabama. At approximately 1233 hours, **"A"** walked into **259 John Morris Avenue** Montgomery, Alabama and made contact with a subject known by **"A"** as

"Curt". "A" advised that he/she asked "Curt" for some crack cocaine. "A" advised that "Curt" advised him/her that he would have to call "Quez" to get the crack cocaine. "A" advised once "Curt" finished the conversation with "Quez" he informed him/her that "Quez" would sell him/her a gram of crack cocaine for fifty dollars. "A" agreed to the deal. "A" advised that after a short period "Quez" entered the residence and passed "Curt" a quantity of crack cocaine and "Curt" gave it to him/her. "A" then gave "Curt" the quantity of Montgomery Police Department Drug Buy Money. This transaction took place at approximately 1240 hours. "A" left the location at approximately1242 hours and met Webster at a prearranged location. At approximately 1247 hours, Webster retrieved the evidence. At approximately 1248 hours, Sergeant Webster and Detectives Ross conducted a search of "A" vehicle/person for any weapons, drugs or contraband. This search yielded five dollars of the Montgomery Police Department Drug Buy Money. The drug evidence was taken back to the Narcotics Division where a weight was taken. The drug evidence was 0.8 grams crack cocaine which tested positive for cocaine base. Sergeant Webster identified "Curt" as Curtis "Curt" Caffie. This controlled drug buy occurred under the direct control and supervision of Sergeant Webster.

23.      On March 19, 2014 at approximately 1041 hours, Sergeant M.K. Webster #1851 and Detective D.R. Ross #2270 met with a confidential source at a prearranged location. This source will hereinafter be referred to as "A". The meeting was in order to arrange a controlled drug purchase from a subject at **259 John Morris Avenue** Montgomery, AL. At approximately 1042 hours, Sergeant Webster and Detective Ross conducted a search of "A"s person/vehicle for any weapons, money or contraband. This search produced negative results. "A" was then provided with $60.00 of the Montgomery Police Department controlled drug buy money and equipped with an audio/video recording device. At approximately 1048 hours, "A" arrived in the area of

**259 John Morris Avenue** Montgomery, Alabama. At approximately 1052 hours, "A" walked into **259 John Morris Avenue** Montgomery, Alabama and made contact with a subject known by "A" as "Quez". "A" advised that he/she asked "Quez" for some crack cocaine. "A" advised that after going back and forth with "Quez" about the price they agreed on or a gram for sixty. "A" advised that "Quez" gave him a quantity of crack cocaine and then he/she gave "Quez" the quantity of Montgomery Police Department Drug Buy Money. This transaction took place at approximately 1056 hours. "A" left the location at approximately 1058 hours and met Webster at a prearranged location. At approximately 1103 hours, Webster retrieved the evidence. At approximately 1248 hours, Sergeant Webster and Detectives Ross conducted a search of "A"s vehicle/person for any weapons, drugs or contraband. This search yielded negative results. The drug evidence was taken back to the Narcotics Division where a weight was taken. The drug evidence was 0.4 grams crack cocaine which tested positive for cocaine base. Sergeant Webster identified "Quez" as Sanquez "Quez" Bivens.

24.     On March 19, 2014 at approximately 1728 hours, Sergeant M.K. Webster #1851 and Detective D.R. Ross #2270 met with a confidential source at a prearranged location to arrange a controlled drug purchase in the 200 block of John Morris Avenue Montgomery, Alabama. At approximately 1735 hours, Sergeant Webster and Detective Ross conducted a search of "A" person/vehicle for any weapons, money or contraband. This search produced negative results. "A" was then provided with $40.00 of the Montgomery Police Department controlled drug buy money and equipped with an audio/video recording device. At approximately 1754 hours, Sergeant Webster advised "A" to walk over to **259 John Morris Avenue** Montgomery, Alabama and attempt to make a drug purchase. "A" advised that he/she walked into **259 John Morris Avenue** Montgomery, Alabama and made contact with "Quez" and asked him for some crack

17

cocaine. "A" advised that another black male subject was sitting inside the residence and "Quez" advised him to sell him/her the crack. "A" advised he/she gave "Quez" the quantity of the Montgomery Police Department Drug Buy Money and that he/she observed the other black male subject weigh the crack cocaine on a digital scale before giving it to him/her. This transaction took place at approximately 1803 hours. "A" left the location at approximately 1804 hours and met Webster at a prearranged location. At approximately 1809 hours, Webster retrieved the evidence. At approximately 1810 hours, Sergeant Webster and Detectives Ross conducted a search of "A"s vehicle/person for any weapons, drugs or contraband. This search yielded negative results. The drug evidence was taken back to the Narcotics Division where a weight was taken. The drug evidence was 0.4 grams crack cocaine which tested positive for cocaine base. Sergeant Webster identified "Quez" as Sanquez "Quez" Bivens.

25.     On March 20, 2014 at approximately 1054 hours, Sergeant M.K. Webster #1851 and Detective D.R. Ross #2270 met with a confidential source at a prearranged location. This source will hereinafter be referred to as "A". The meeting was in order to arrange a controlled drug purchase from a subject at 259 John Morris Avenue Montgomery, AL. At approximately 1055 hours, Sergeant Webster and Detective Ross conducted a search of "A"s person/vehicle for any weapons, money or contraband. This search produced negative results. "A" was then provided with $60.00 of the Montgomery Police Department controlled drug buy money and equipped with an audio/video recording device. At approximately 1107 hours, "A" arrived in the area of **259 John Morris Avenue** Montgomery, Alabama. "A" advised that while traveling in the 100 block of Martin Patton Avenue Montgomery, Alabama in route to **259 John Morris Avenue** Montgomery, Alabama he/she observed a subject known to him/her as "Quez" in a gold Dodge Stratus. "A" advised that "Quez" asked him/her what he was trying to get. **"A"** advised "Quez''

a fifty (crack cocaine). "A" advised that "Quez" told him/her to give him the money and he would meet him at the store. "A" declined and "Quez" told him/her to pull up in front of the house and he would be there. At approximately 1110 hours, "A" pulled in front of **259 John Morris Avenue** Montgomery, Alabama and "Quez" pulled up and walked to "A"s vehicle. "A" advised that "Quez" got the quantity of the Montgomery Police Department Drug Buy Money and walked into **259 John Morris Avenue** Montgomery, Alabama. "A" advised that "Quez" returned from the residence and sold him/her a quantity of crack cocaine and gave him/her change. This transaction took place at approximately 1116 hours. "A" left the location at approximately 1118 hours and met Webster at a prearranged location. At approximately 1123 hours, Webster retrieved the evidence and conducted a search of "A"s vehicle/person for any weapons, drugs or contraband. This search yielded ten dollars in assorted U.S. Currency. The drug evidence was taken back to the Narcotics Division where a weight was taken. The drug evidence was 0.4 grams crack cocaine which tested positive for cocaine base. Sergeant Webster identified "Quez" as Sanquez "Quez" Bivens. This controlled drug buy occurred under the direct control and supervision of Sergeant Webster.

26.     On March 22, 2014 at approximately 1416 hours, Sergeant M.K. Webster #1851 and Detective D.R. Ross #2270 met with a confidential source at a prearranged location. This source will hereinafter be referred to as "A". The meeting was in order to arrange a controlled drug purchase from a subject at **259 John Morris Avenue** Montgomery, AL. At approximately 1418 hours, Sergeant Webster and Detective Ross conducted a search of "A"s person/vehicle for any weapons, money or contraband. This search produced $106.00 in assorted U.S. Currency. This money was taken by Sergeant Webster until the completion of the drug buy. "A" was then provided with $40.00 of the Montgomery Police Department controlled drug buy money and

equipped with an audio/video recording device. At approximately 1427 hours, "A" arrived in the area of **259 John Morris Avenue** Montgomery, Alabama. At approximately 1430 hours, "A" pulled in front of **259 John Morris Avenue** Montgomery, Alabama and walked into **259 John Morris Avenue** Montgomery, Alabama. "A" advised that once inside the residence he made contact with a black male subject sitting on the couch wearing a blue shirt and a blue Indianapolis Colts hat. "A" advised that he asked this subject for a forty (crack cocaine). "A" advised that the subject retrieved a quantity of crack cocaine and sold it to him/her. "A" gave the subject the quantity of the Montgomery Police Department Drug Buy Money. This transaction took place at approximately 1431 hours. "A" left the location at approximately 1432 hours and met Webster at a prearranged location. At approximately 1440 hours, Webster retrieved the evidence and conducted a search of "A"s vehicle/person for any weapons, drugs or contraband. This search yielded negative results. Sergeant Webster returned the $106.00 to "A". The drug evidence was taken back to the Narcotics Division where a weight was taken. The drug evidence was 0.4 grams crack cocaine which tested positive for cocaine base. Sergeant Webster was able to review the video from this controlled buy and identify the subject as black male "Dewayne "Kemonte" Thomas.

27.     On March 22, 2014 at approximately 1552 hours, Sergeant M.K. Webster #1851 and Detective D.R. Ross #2270 met with confidential source "A" at a prearranged location in order to arrange a controlled drug purchase from "Kemonte" at **259 John Morris Avenue** Montgomery, AL. At approximately 1555 hours, Sergeant Webster and Detective Ross conducted a search of "A"s person/vehicle for any weapons, money or contraband. This search produced $220.00 in assorted U.S. Currency. This money was taken by Sergeant Webster until the completion of the drug buy. "A" was then provided with $40.00 of the Montgomery Police

Department controlled drug buy money and equipped with an audio/video recording device. At approximately 1604 hours, "A" arrived in the area of **259 John Morris Avenue** Montgomery, Alabama. At approximately 1607 hours, "A" pulled in front of **259 John Morris Avenue** Montgomery, Alabama and walked into **259 John Morris Avenue** Montgomery, Alabama. "A" advised that once inside the residence "Kemonte" was sitting on the couch wearing a blue shirt and a blue Indianapolis Colts hat. "A" advised that he/she asked "Kemonte" for a forty (crack cocaine). "A" advised the subject retrieved a quantity of crack cocaine and sold it to him/her. "A" gave the subject the quantity of the Montgomery Police Department Drug Buy Money. This transaction took place at approximately 1608 hours. "A" left the location at approximately 1609 hours and met Webster at a prearranged location. At approximately 1613 hours, Webster retrieved the evidence and conducted a search of "A"s vehicle/person for any weapons, drugs or contraband. This search yielded negative results. Sergeant Webster returned the $220.00 to "A". The drug evidence was taken back to the Narcotics Division where a weight was taken. The drug evidence was 0.4 grams crack cocaine which tested positive for cocaine base. Sergeant Webster was able to identify "Kemonte" as being Dewayne "Kemonte" Thomas.

28.    On March 24, 2014 at approximately 1132 hours, Sergeant M.K. Webster #1851 and Detective J.M. Stewart #1730 met with confidential source "A" at a prearranged location in order to arrange a controlled drug purchase from "Kemonte" at **259 John Morris Avenue** Montgomery, AL. At approximately 1135 hours, Sergeant Webster and Detective Stewart conducted a search of "A"s person/vehicle for any weapons, money or contraband. This search produced negative results. "A" was then provided with $220.00 of the Montgomery Police Department controlled drug buy money and equipped with an audio/video recording device. At approximately 1144 hours, "A" arrived in the area of **259 John Morris Avenue** Montgomery,

21

Alabama. At approximately 1148 hours, "A" pulled in front of **259 John Morris Avenue**

Montgomery, Alabama and walked into **259 John Morris Avenue** Montgomery, Alabama. "A"

advised that once inside the residence "Kemonte" was sitting on the couch. "A" advised that

he/she asked "Kemonte" for a forty (crack cocaine). "A" advised that the subject retrieved a

quantity of crack cocaine and sold it to him/her. "A" gave the subject the quantity of the

Montgomery Police Department Drug Buy Money. This transaction took place at approximately

1149 hours. "A" left the location at approximately 1150 hours and met Sergeant Webster at a

prearranged location. At approximately 1155 hours, Webster retrieved the evidence and

conducted a search of "A"s vehicle/person for any weapons, drugs or contraband. This search

yielded $180.00 of the Montgomery Police Department Drug Buy Money. The drug evidence

was taken back to the Narcotics Division where a weight was taken. The drug evidence was 0.4

grams crack cocaine which tested positive for cocaine base. Sergeant Webster was able to

identify "Kemonte" as being Dewayne "Kemonte" Thomas.

29.     On April 05, 2014 at approximately 1644 hours, Sergeant M.K. Webster #1851 and

Detective S.L. Meyer #2206 met with confidential source "A" at a prearranged location in order

to arrange a controlled drug purchase from a subject at **259 John Morris Avenue** Montgomery,

AL. At approximately 1646 hours, Sergeant Webster conducted a search of "A"s person/vehicle

for any weapons, money or contraband. This search produced $58.00 in assorted U.S. Currency.

This money was taken by Sergeant Webster until the completion of the drug buy. "A" was then

provided with $240.00 of the Montgomery Police Department controlled drug buy money and

equipped with an audio/video recording device. At approximately 1653 hours, "A" arrived in the

area of **259 John Morris Avenue** Montgomery, Alabama. At approximately 1657 hours, "A"

pulled in front of 259 John Morris Avenue Montgomery, Alabama and walked up to the front

porch of **259 John Morris Avenue** Montgomery, Alabama. "A" advised that a black male wearing a hat was sitting on the porch. "A" advised that he/she asked the subject, "who had some hard" (crack cocaine). "A" advised the subject then walked into the residence. Once inside "A" advised he asked this subject for a forty (crack cocaine). "A" advised that the subject retrieved a quantity of crack cocaine and sold it to him/her. "A" gave the subject the quantity of the Montgomery Police Department Drug Buy Money. This transaction took place at approximately 1659 hours. While waiting on the subject to sell him/her a quantity of crack cocaine, "A" asked the subject if he knew anyone trying to sell any "Iron" (a handgun). The subject then pulled out what he identified as a Taurus .45 caliber handgun. The subject advised "A" he wanted $300.00 for the gun. "A" advised the subject that it was more than what he/she wanted to spend. "A" left the location at approximately 1700 hours and met Webster at a prearranged location. At approximately 1705 hours, Webster retrieved the evidence and conducted a search of "A"s vehicle/person for any weapons, drugs or contraband. This search produced $200.00 of the Montgomery Police Department Drug Buy Money. Sergeant Webster returned the $58.00 to "A". The drug evidence was taken back to the Narcotics Division where a weight was taken. The drug evidence was 0.4 grams crack cocaine which tested positive for cocaine base. Sergeant Webster was able to review the video from this controlled buy and identify the subject as Raydreco **"Ray-Ray" Gardner**.

30.     On April 08, 2014 at approximately 1229 hours, Sergeant M.K. Webster #1851 and Detective D.R. Ross #2270 met with confidential source "A" in order to arrange a controlled drug purchase from a subject in the 200 block of John Morris Avenue Montgomery, AL. At approximately 1231 hours, Sergeant Webster conducted a search of "A"s person/vehicle for any weapons, money or contraband. This search produced $59.00 in assorted U.S. Currency. This

money was taken by Sergeant Webster until the completion of the drug buy. "A" was then provided with $400.00 of the Montgomery Police Department controlled drug buy money and equipped with an audio/video recording device. At approximately 1241 hours, "A" arrived in the area of the 200 block of John Morris Avenue Montgomery, Alabama. At approximately 1246 hours, "A" pulled in front of 271 John Morris Avenue Montgomery, Alabama and walked to a vacant lot where several subjects were sitting. "A" asked a subject if "Marquis" was at the house and the subject told him "no". "A" walked down to **259 John Morris Avenue** and knocked on the door and was allowed to enter the residence. "A" advised that a black male wearing a black hat, black shirt and two large gold necklaces, was sitting inside the residence on the couch. "A" told the subject that he was looking to buy some "work". "A" advised that this subject told another black male subject who was sitting in a chair in the corner of the living room to go and get the stuff from the back. "A" advised that once this subject returned he gave the subject on the couch what appeared to be an ounce and a half of crack cocaine. "A" told the subject he/she wanted a fifty (crack cocaine). "A" advised that the subject retrieved a quantity of crack cocaine and sold it to him/her. "A" gave the subject $60.00 of the Montgomery Police Department Drug Buy Money. The subject gave "A" $8.00 in change because he didn't have correct change. This transaction took place at approximately 1249 hours. "A" left the location at approximately 1253 hours and met Webster at a prearranged location. At approximately 1257 hours, Webster retrieved the evidence and conducted a search of "A"s vehicle/person for any weapons, drugs or contraband. This search produced $348.00 of the Montgomery Police Department Drug Buy Money. Sergeant Webster returned the $59.00 to "A". The drug evidence was taken back to the Narcotics Division where a weight was taken. The drug evidence was 0.4 grams crack cocaine

24

which tested positive for cocaine base. Sergeant Webster was able to review the video from this controlled buy and identify the subject as black male "**Earnest "JR" STROMER**.

31.     During the course of the investigation, Agents learned that **STROMER** was in the process of building a new residence near 259 John Morris, seemingly using proceeds from his illegal activities. On September 8, 2014, Agents observed a black Honda Accord and gold Dodge Stratus parked at **189 John Morris Avenue**. Agents have observed **STROMER** operate the same Dodge Stratus on multiple occasions. On September 19, 2014, Agents conducted surveillance at **189 John Morris Avenue** and observed a gold Nissan Altima with Alabama vehicle tag 3A38W1 parked at the residence. Agents conducted a vehicle registration search of this vehicle and observe the vehicle to be registered to NIKIA SIMMONS, known by Agents to be the girlfriend of **STROMER.**

32.     On Friday, September 26, 2014 at approximately 1832 hours, Sergeant M.K. Webster #1851 and Detective D.R. Ross #2270 met with confidential source "A" at a prearranged location in order to arrange a controlled drug purchase from a subject in the 200 block of John Morris Avenue Montgomery, AL. At approximately 1833 hours, Sergeant Webster conducted a search of "A"s person/vehicle for any weapons, money or contraband. This search produced negative results. "A" was then provided with $40.00 of Montgomery Police Department controlled drug buy money and equipped with an audio transmitting device. At approximately 1837 hours, "A" arrived in the area of the 200 block of John Morris Avenue Montgomery, Alabama. At approximately 1839 hours, "A" pulled in front of **259 John Morris Avenue** Montgomery, Alabama and walked to the residence. "A" advised that the black male subject he/she had purchased crack cocaine from during another controlled drug buy under the control of Sergeant Webster, was standing on the side of the residence. ("A" advised that the subject is

always wearing the long gold chains.) "A" advised that he/she told the subject he/she wanted to get something. "A" advised that he/she and the subject then walked into **259 John Morris Avenue**, Montgomery, Alabama. "A" advised once inside the residence he/she gave the subject the quantity of the Montgomery Police Drug Buy Money and the subject gave him/her a quantity of crack cocaine. This transaction took place at approximately 1845 hours. "A" left the location at approximately 1846 hours and met Webster at a prearranged location. At approximately 1850 hours, Webster retrieved the evidence, conducted a search of "A"s vehicle/person for any weapons, drugs or contraband, which produced negative results. The drug evidence was taken back to the Narcotics Division where a weight was taken. The drug evidence was 0.6 grams crack cocaine which tested positive for cocaine base. Sergeant Webster was able to identify the distributor of the illegal drugs as **"Earnest "JR" Stromer**.

33.     On October 1, 2014, FBI SA Murray conducted a search of the Thompson Reuters database. SA Murray observed the report to indicate that the current home address for **STROMER** is **189 John Morris Avenue,** Montgomery, Alabama, with utilities commencing service on June 29, 2014 and August 24, 2014. The same database reported the home address of NIKIA SIMMONS to also be **189 John Morris Avenue** with utilities in her name activating on May 30, 2014. On October 2, 2014, SA Murray confirmed with a representative from Alabama Power that an account was activated for that location on May 27, 2014 in the name of NIKIA SIMMONS. The primary telephone number for the account was 334-233-8386 with a secondary number of 334-414-6031 (**STROMER's** telephone number).

34.     Based on my training and experience I know that drug dealers often reside at one residence and maintain other location(s) as distribution locations. This arrangement exists for many of the same reasons a legitimate business person would live in a location separate from his

26

business but in the case of a drug dealer it is done so that he or she may reside away from high-traffic criminal activity that could draw the attention of law enforcement or other criminals.

35.     I also know, through my training and experience, that drug dealers will store large amounts of drugs, money, communications devices, records and firearms, at their residence that they would otherwise trust with subordinates and/or out of their immediate control.

36.     I also know that proceeds of drug trafficking are often evidenced through housing costs and other personal expenditures. The bills and documentation of those expenditures are typically not going to be left in a high-traffic house from where drugs are sold, rather, they will be kept at the residence of that person, just as a layperson would keep their personal bills and expenditures at their residence, rather than at his/her place of employment.

## CONCLUSION

37.     Based on the foregoing, your Affiant further believes that probable cause exists that **STROMER** has operated **259 John Morris Avenue** as a drug distribution location and is now maintaining a residence at **189 John Morris Avenue**. Therefore, probable causes exists that on the premises, property and persons described herein there is to be found fruits, evidence and instrumentalities of criminal offenses against the United States to include Title 18, Untied States Code, Section 1956, Section 1957, and Section 924(c) and Title 31, United States Code, Section 5313 and Section 5324, as well as evidence, fruits, instrumentalities of violations of Title 21, United States Code, Section 841 and Section 846. Attachment B sets forth items to be seized as evidence of the aforesaid crimes.

38.     Drug traffickers often maintain in their wallet, purse or pockets, telephone numbers of drug associates, safe deposit box keys, cash receipts of expenditures or other documents such as

27

business cards, providing leads to the disposition of drug proceeds. Therefore, it is requested that all aforementioned persons be searched for evidence of drug trafficking.

38.       Drug traffickers are also known to use their vehicles to transport drugs, store drug proceeds and store records relating to their drug activities, such as gasoline tickets revealing out of town trips. Therefore, it is requested that all vehicles on the aforementioned premises be searched for evidence of drug trafficking.

Respectfully submitted,

Dennis R. Reed, II
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this the **7th** day of October, 2014.

Honorable  Susan Russ Walker
United States Magistrate Judge
Middle District of Alabama

28

## ATTACHMENT A

**189 John Morris Avenue Montgomery, Alabama**



### ATTACHMENT B

### PROPERTY TO BE SEIZED

(1)     Books, records, ledgers, and/or writings which record the receipt and/or distribution of controlled substances, including cocaine and marijuana, as well as any other memoranda relating to the transportation, ordering, purchase, delivery and/or distribution of controlled substances, which writings and records are contraband as well as evidence;

(2)     Papers, tickets, notes, schedules, receipts, and other writings and objects including but not limited to gasoline receipts, air travel vouchers, and motel/hotel embossed articles, which do or tend to establish domestic and/or interstate travel in interstate commerce, which may lead to evidence of additional co-conspirators in criminal activity;

(3)     Addresses and/or telephone books and papers and other writings reflecting names, addresses, and/or telephone numbers as well as bills and paid receipts reflecting telephone toll records, any and all of which reflect the names, addresses, and telephone numbers of aliases or code names of both known and unknown co-conspirators in the above-described criminal activity, as well as other indicia of telephone usage and service including pay telephone usage which indicia includes, but is not limited to, telephone credit cards, large amounts of nickel, dime and/or quarter currency, and telephone paging devices which are carried on or about the persons to receive incoming notice or messages and which are activated by telephone usage. Documents related to financial transactions including but not limited to the use of pre-paid credit cards or other financial instruments;

(4)     Currency of the United States including paper and coin currency, also precious metals, jewelry, financial instruments, including but not limited to, negotiable commercial paper, and currency obtained, connected with and/or possessed to facilitate the financing of illicit drug trafficking;

(5)     Photographs and videotapes, in particular, photographs or videotapes of co-conspirators, of assets, and/or of controlled substances, in particular, cocaine and marijuana;

(6)     Safes, strong boxes, and/or other secure receptacles for the maintenance of valuable items and/or important documents including books, records, and other writings as well as United States currency as described above, and any keys or other evidence of the existence and usage of any lockers, safety deposit boxes or other secure receptacles situated elsewhere than at the subject property;

(7)     Articles of false identification;

(8)     Cellular phones and cellular telephone chargers;

(9)     All information stored inside a caller identification box associated with any telephone land line found in said residence or business;

(10)    Radio electronic equipment including but not limited to transceivers, receivers, scanners, antennae, RF detectors, walkie talkies, wireless transmitters as well as other electronics which are used ancillary to such equipment, including but not limited to, electrical calibration equipment, meters and test equipment;

(11)    Computers or other electronic devices which are capable of storing data or information, including, but not limited to computers, laptops, tablets, floppy disks, compact disks, zip disks, hard drives, and personal data assistants;

(12)    Firearms and ammunition;

(13)    Any controlled substances;

(14)    Paraphernalia for packaging, cutting, weighing, and distributing controlled substances, including but not limited to, scales, bags, pipes, and duct tape;

(15)    All documents or records indicating ownership, control, or occupancy of the property; and

(16)    Any and all other material evidence of violations of Title 21, United States Code, Sections 841(a)(1), and 846; and Title 18, United States Code, Section 924(c), together with fruits, instrumentalities and evidence of crimes at this time unknown.